Good morning. May it please the Court, my name is Gregory Siskin, on behalf of the Appeal and Staff Nordstrom. With me at council table are certified law students Bridget Duffus and Kathryn Kohler. I know I need to watch my own time, but I'll try to reserve five minutes. Very good. We'll try to help you. We're grateful for your bringing these, buying a lawyer to be into the courtroom. It's a great program. We're pleased. Thank you, Your Honor. You get a chance to see the professor answer questions. I've heard James describing them. They want him to ask some questions, don't they? They've been asking quite a few during practices. I also apologize in advance. I'm recovering from a cold, and I'm going to have to sip water frequently, so my voice does not appear good. Please feel free to do so. Your Honors, we live in a world of amazing and instantaneous communications technology. Email, Twitter, Snapchat. So the old-fashioned letter sent you to the post office may seem rather quaint. But for a prisoner isolated in his death row cell, being in a written letter to his lawyer is a lifeline. And we are here this morning because the Arizona Department of Corrections has cut that lifeline. Before we get to that, we're still in the merits issue, as you know, from our order, which both counsel have responded. Before we get to that, we have to deal with the issue of jurisdiction. Yes, Your Honor. I know your position. I know the state's position. But I suspect my colleagues have some questions as well. As you know, under the Constitution, we can only decide cases where there's a case in controversy. And in this case, we have a petitioner who is now proceeding in what most would call an appellate situation. He's proceeding under Arizona rules. Let me get the technical name here. It was number 32. I'm sorry, Arizona rules. Procedure 32. Do you agree that that's an appellate procedure? I think it's before a state trial judge. It's the first stage of the post-conviction proceedings. If the trial judge is considering that matter, I checked on the status of that. The court has indicated that it hopes to have an initial ruling by the end of March, although I'm also told it would not be a surprise if that were delayed into December or the fall. I appreciate that. My question, though, counsel, is whether that is an appellate proceeding. By that, I mean the initial proceeding, the conviction is over. Now he's trying to get collateral review. Is that correct? It is collateral review. This is not a direct appeal from the criminal suit. So by definition, that is an appeal. It's not an initial direct adjoiction, right? You know, I think it falls into it. It's not exactly an appeal. If the trial court, the next step the trial court may take would be to hold an evidentiary hearing on the post-conviction petition, the sort of thing that doesn't typically happen before an appellate court. I do agree, Your Honor, and would never suggest it otherwise, that it is not part of the direct appeal from the criminal sentence. And let me speak to the z-ending issues, as the court asked us to address in the subcriminal brief. There are two legal paths, same legal end in this case. One of those paths is short and direct, and the other is longer and has some twists and turns. The short and direct path is through the First Amendment, and that's the path that most circuits have adopted in considering and guaranteeing the confidentiality of legal bail. With respect to the First Amendment, there is not a difficulty with standing here. There is no question about a continuing case or controversy. The First Amendment covers confidentiality, and what case law do you rely for that position? The case law we rely on in particular, as we've referred to in our brief, are the decisions of the Third Circuit in Jones v. Barnes and the decision of the Eleventh Circuit in the Alameda case, both of which held that the only showing necessary for standing when a First Amendment claim is raised is that the prisoner has been chilled in communication with the lawyer. And this applies not only to criminal matters but also to civil matters. With respect to the Sixth Amendment claim, the route to the merits is a little bit longer, and there are some twists and turns along the way. There are questions about the law of the case here. There are questions about whether the Sixth Amendment applies to initial review of post-invention proceedings, such as Mr. Norton's from his race. Let me ask you this. If, as the decorous law students would say, Margie Wendell, because I know they use that term all the time, right? Margie Wendell, if this panel were to conclude that the previous panel mistakenly thought it had jurisdiction and it did not, what would our right be to ignore what they said? Because we cannot act without jurisdiction at any point. Your Honor, this Court has said on more than one occasion that there is not a jurisdictional exception, there is not a standing exception to the law of the case doctrine. Now, what case do you rely on for that? I don't have them directly in front of me. We cite into both of those in the supplemental brief. You're saying that when the law of the case is concerned, there's an automatic standing, even to say hypothetically that our Court decided a case and it is absolutely clear that there was no standing, but they decided it anyway. Is your position that we would be bound by the, with respect to that case, even though the Court had no jurisdiction to act? Because this Court has held that standing questions, jurisdictional questions fall within the law of the case doctrine. But does that limit it to only cases where they actually decided the issue is clearly presented to them and they make that, in its argument, they make a finding of the existence of standing, or does it, you know, obviously the standing is jurisdictional, so if they decided they found that there's personal jurisdiction as a result of their existence of standing, but does it make any difference whether it's just implicit or if it's explicit? Your Honor, the law of the case doctrine applies not only to those matters that were actually decided by the previous panel, but those that are necessarily implied in the decision that was made in the prior panel reached the merits. In addition, and I have to correct the Arizona supplemental brief on this point, is not correct. There were no standing issues briefed and decided in the prior decision. In fact, the standing question before the Court was the type of injury that's required in order to bring a Sixth Amendment prospective relief claim. Did you have to meet the difficult Strickland test, or was it a mere tooling of the communications? That was briefed forthrightly as a standing issue, and the cases that were cited are a standing issue, and the Court's ruling on that is a standing analysis. Let me emphasize, though, two things here with respect to standing. Again, the First Amendment doesn't raise these standing issues in the rulings of other circuits guaranteeing confidentiality, legal mail, and First Amendment cases. In addition, this is not really a standing problem. Even if the law of the case doesn't apply, it's a modus case, not a standing case. Standing is determined as of the time that the complaint is filed. Arizona is setting a supplemental brief. That's not part of case law, is it? You have to have standing throughout? You have to have a live controversy that extends throughout the case, but standing itself is determined as of the date of the filing of the complaint. If subsequent events change the status, there is a question about whether that controversy is continuing. That's a question of modus. Arizona has set a supplemental brief that the Sixth Amendment does not apply to direct criminal appeals. That is not correct. Since the Supreme Court's decision in Douglas v. California a half-century ago, the right to effective assistance of counsel in criminal appeals is guaranteed by the Constitution. And this Court said in 2013, in the Havan Nguyen case, said explicitly, the Sixth Amendment right to effective assistance of counsel applies equally to both trial and appellate proceedings. Mr. Nordstrom was indisputably involved in a direct appeal within the criminal system at the time that the complaint was filed. Afterwards, that appeal was decided in 2012, decided before the briefing of the states in Nordstrom 1. So what we have before us is really a modus question. In our view, this case falls within the capable of repetition and evading review exception to the modus. Could I grab it over here? Your briefing on that point, but I'd like to go back to the standing issue for a moment. Based upon the court adverse of Donovan, one of our cases, the standing issue is not just an issue of what happened at the time. The case was filed. It runs throughout the case. And if you lose standing, you lose the ability on our part to decide the case. So I go back to my previous question, which was, if we were to find arguendo that the first panel didn't, even if they decided they were wrong on the jurisdictional issue and it was clear based upon the Supreme Court precedent that they were wrong, what would we do? Would the law of the case in this situation, would we be bound by a mistake in ruling, or are we free to question it based upon the standing point? I don't think under the law of the case, this court can essentially airbrush away Nordstrom 1. Nordstrom 1 decided the merits of the case in the Sixth Amendment and to declare otherwise would undo that decision. I need to push back, though, on the standing point. Courts are not always careful about their use of terms when it comes to live controversy matters. But this court said in the Snuff case, standing is established on the facts as they exist at the time the plaintiff files the complaint. When subsequent events occur that change that status, it's not a question of mootness. It's still a question of the live controversy requirement. I mean, it's not a question of standing. It's still a question of live controversy requirement. At that point, it's a mootness question. I see my time is up. I do want to save some time. I do want to save some time before I get to the merits. I would like to get to the merits. Would you like me to speak to the merits briefly? Let me do that. That's more important than me reserving time for rebuttal. I think the simplest way to look at this case is that indeed this court of Nordstrom 1 said reading of outgoing legal mail is not permissible. But reading is exactly what the Arizona Department of Corrections is doing here. The Arizona protocol is to scan through each page of the letter for up to 30 seconds, lingering on so-called keywords and evaluating whether the letter is sufficiently directed to legal proceedings in cases or instead is personal in nature. That's reading. And in fact, the correctional officer in charge of collecting the letters on death row testified that he understood his duty to hastily read legal mail. It seems to be your position that no review of the letter at all was permitted, is that correct? No review of the substance of the contents of the letter. That's right. Once the person begins to look at the words of the letter, that is the reading. That inhibits candid communication, which this court of Nordstrom 1 said was the measuring stick for what was permissible. Does it inhibit candid communication? Or do you draw a line between reading and scanning? Scanning, the Nordstrom 1 court used scanning interchangeably with inspection. I think the best way to describe scanning and inspection would be to look at what the California Department of Corrections does. So they take the letter, they inspect the envelope to make sure that there's no contraband in the envelope, and holding the letter upside down so that it's unread, they scan through it to make sure there aren't what this court called such suspicious features as a map of the prison. That's scanning. Once you begin to access the content of the letter, confidentiality is wholly lost. The Nordstrom 1 decision becomes nullity. That's reading. That inhibits candid communication, and that is what this court said in Nordstrom 1 was not permissible. Thank you. Okay. Is that restrictive? Yes, thank you. Okay. I'll bring in the leader from the state of Arizona. Family support. Neil Singh is the Attorney General here for defendants. I have with me Director Ryan and a real party in the state of Arizona. I thought I would start by defining the problem. The problem, as it was presented to the district court with my testimony and exhibits, I think is, well, I'll start by summarizing what the detective told the district court from the Phoenix Police Department that in Phoenix, of course, the district court is one of the country's larger metropolitan areas. He works, Detective Davis, who testified, works for the gangs bureau of the Phoenix Police Department, and he testified that his bureau, almost all of its investigations have ties to air zones, prisons, and jails. So that is the problem that we are trying to deal with. He also provided testimony in an exhibit, group exhibits, that the primary tools he had, this is a verbatim quote, one of the primary tools used by the Arizona Mexican Mafia. You can see that Arizona is the use of legal mail. He testified to that on page 117 of the transcript, which you can find in SUR 67-9. What I don't understand is if that's the case, and things are found every day and so forth, that we've never been pointed to an illustration of a letter to an actual attorney that presented this problem. Is there any evidence of something having been caught? How many years has this policy been in effect? That I don't know, Your Honor. It's years. Right. And nothing's ever been caught? Well, nothing's been caught in that specific subset. Actual legal mail sent to an actual legitimate attorney, there are thousands, and that word is in the transcript, thousands of instances of legal mail being misused for fraudulent purposes. But not one of them is an actual transmission to an actual attorney. I mean, something that's addressed to the right place. Well, so what's wrong with plaintiff's alternative, which is, okay, we have the ones that are sent to somebody just in the guise of an attorney, but if this person, if John Smith is registered as my counsel, and I'm sending it to John Smith's address, there's never been an instance of that having been detected as a problem. What's wrong with that alternative? Well, one problem, which was actually, and this was part of the record, one of the examples of illicit communication and illicit behavior regarding the legal privilege involved a mitigation specialist. So prisoners are not just writing letters to licensed attorneys who have established addresses which can be used. Well, that raises two questions. One, is there any evidence of a problem with a letter to a mitigation specialist who has been registered as being this prisoner's actual mitigation specialist? No, there aren't. So that's not anything different. And besides, we take mitigation specialists off, limit it to attorneys. You want to communicate with your mitigation specialist, you've got to send it to your attorney who presumably can forward it at that point. We're still looking at a null set so far of problems. If communications to actual attorneys at actual addresses are considered. Your Honor, one thing that sets this case apart from the other cases that have been cited, the circuit cases, is that we're not just dealing with hypotheticals. We actually have in Arizona, I don't know what's going on in Arizona, but we have three lawyers who were found to be conspiring with criminal gang members in using illegal male privilege, or at least using illegal privilege. I'm not sure we're clear about how exactly they performed their actions. I didn't know. I think Judge Hammer referred to one of those as somebody who had appeared in court, but I wasn't aware that the names Matt and Dick Kinley were all three of those Arizona counsels. Yes, there were three licensed attorneys who were found, and I believe all three were convicted of various crimes, and then there's the mitigation specialist involved. Detective Davis testified to it. His testimony, Your Honor, starts, again, it's FNCR 67-9 at 94. CR 67-9. Yes, his testimony starts at 94. I had him describe to the district court those examples. I believe he was involved in all three of those attorney cases. Your point is that contrary to our previous understanding, there are actual examples of letters going to members of the bar who are in lien with prisoners who are conducting illicit activities. Are you right? Not so fast, no. I think what you said is there are attorneys who have gone wrong. Yes. There's still no evidence of any letters being sent to those attorneys. Any evidence being improper? You're right, Your Honor. Yes, there's nothing in the records that's that specific. My point and the point of the testimony was that attorneys do engage in this behavior. How many attorneys do you have in Arizona? I don't know. I don't know. Maybe thousands? Yeah. I'm sure we have thousands of clients, and we have thousands in Arizona. I'm sure we do. So we have three bad apples. Right. Let's boil the whole batch. Well, not the attorneys, but the employees. We have lots of bad apples in jail. I don't question that. But if we focus on communications to actual attorneys, I mean, I'm not impressed. I understand the theoretical risk. I'm not very impressed by the evidence that it's a practical problem. Your Honor, on page 173 of the same transcript I'm referring to, 67-9, there was a discussion of a letter from a person named Brian Hunter, and what Mr. Hunter did was he starts out the first part of the letter trying to sound like he's talking to a lawyer. It's a consensual discussion. Right in the middle of the letter he switches, and these are the actual verbatim words. He is, quote, they've given this correspondence, the appearance of legal mail, email legal contents cannot be read or reviewed, end quote. So the problem, we know prisoners, I mean, they're criminals. That's why they're in jail. They can't be trusted, and they can do dumb things, and it's also why most of them are in jail. So for him to write that reminds me of a witness in an address case that I was defending a long time ago, and that physician talked about a collusive meeting, dumb people all over the place. But that still doesn't tell me that there's a particular problem in something that wasn't sent to an actual attorney at the actual address. However, what it did, what it does tell the court, is that the problem is key. Exploitation of legal mail is well known. It is widespread, and it is so widespread that the Arizona Mexican Mafia and other gangs, including the Antiorean Brotherhood, use legal mail commonly, and there is no doubt about that. And despite that motivation, and despite their knowledge that it gets read, and despite the fact that their system discovers these things every single day, they're not doing it by sending it to actual attorneys. I mean, I got the same problem with results. I was reading, yeah, there's reason to look, but if you've checked out that it's gone to where it's supposed to go to, and that's actually how the procedures work. I don't know, and that's a problem for a plaintiff, because the system was set up with a Supreme Court, didn't set it as a minimum, and said a wolf is okay, but he was having it looked at in the presence of the inmate in order to prevent reading. I can do that with a system that says, well, how can we check out this address? Whether that's your Irish correction officer walking down the sidewalk isn't going to know who the real attorneys are and what their addresses are. So I'm not trying to say that this is an easy system, but I'm still, we're trying to weigh things here. The theoretical problem I understand. The prisoner's problem I understand. And I thought, I'll confess that the, I think it's the Equal Justice Institute, Amicus Brief really spoke to me. They're off in Alabama. They're representing death row people all over the place. How are they supposed to practically communicate with people except by sending stuff back and forth? So you quarrel with the fact that there is a concern on the part of plaintiffs that people like the plaintiffs in order to communicate effectively with counsel. I don't hear the state saying, well, no, they don't have a legitimate interest. So I'm trying to figure out how heavy is the weight on the other side, and that's where I'm having some difficulty. Well, I mean, certainly, you know, obviously the state being able to look at a letter and even inspect a letter, of course, that does intrude somewhat into the privacy of the communication. And the state have been consistent in acknowledging that from the front. And I think it's been an ad hoc recognition that it's a problem. Indeed, the U.S. Supreme Court, I think, in its Wolf decision, was aware and also acknowledged that problem. And that's why it blasted and torched the, I think it was Nebraska prisons, which started all of this, the case off there. It's an imperfect system. It's an imperfect balance. The state, as you pointed out, is not able to catch or detect every single crime that is occurring. And the prisoner's ability to communicate through written letters is also not perfectly confidential. But because this interaction takes place right at the south front, in this case, Mr. Nordstrom, I think you concurred right at its south front, the one incident that we're talking about in 2011. There's transparency there, which I think was the U.S. Supreme Court's intent when it issued its decision in Wolf, that at least, look, the prison is going to look at this letter. We don't really like that. But the fact that the prisoner can be there and document if there is some sort of an incident is some sort of check and balance. And that check and balance actually works out in this case, because Mr. Nordstrom didn't document his disagreement with the way Officer Hawthorne was looking at his letter. He wrote an agreement. It's been fully aired. It's now been vetted by the district court, by this court, on two occasions. So this new perfect balancing system of checks and balances has been working, and I'm aware of no other system that would happen to be better. Maybe 50 years in the future, we'll have technology that manages communications between prisoners and the outside world differently. I think the federal government is starting to do that, actually, but nothing about that in this record. But Arizona started doing that. It's got a large prison population. It's about 40,000 prisoners, and these drug sponsors have a very difficult job to do. So it's the best that they can manage the situation. I mentioned that Judge Campbell accurately observed that he was trying to figure out best practices, so he was only going to give some degree of consideration to what he was told about was happening in other states and in the Federal Bureau of Prisons. I represent him, too, as at least some number of states in the Federal Bureau of Prisons have opted for a course that doesn't involve any scanning, for lack of another word. To begin with, is that your understanding as well? There are at least some prison systems that have given up on that or decided not to pursue it. Right. Some prison systems have adopted policies that say we're not going to visually scan unless there's something very specific that comes up, and, yes, it appears that roughly half, and both sides have quibbled about this, but roughly half of the states don't appear to have policies that permit visual scanning. Roughly half do. Is there any evidence from those states or the systems that don't of subsequent discovery of improper communications in those envelopes? Nothing, nothing on the record, Your Honor, and nothing that I'm aware of as well. With respect to scanning, I would just like to briefly mention that the ‑‑ well, first of all, one of the questions the court asked my opposite counsel was whether a Rule 32 proceeding is a appellate proceeding or not. The state did address that question on page 18 of its answering brief. I believe that it is not an appellate proceeding to the extent that's relevant. Also, the state is clearly not briefed. Mr. Bishop, did Arizona say that prisoners of fraud, post‑conviction, collateral proceedings cannot use lawyers? I mean, there's no states that have a right to provide counsel, appoint counsel. Could Arizona say that you don't get a lawyer period? I think that Arizona law would require the Arizona prison to preclude the Arizona prison from interfering with an attorney's lawyer. So she's having ‑‑ this is one of the things that's troubling me about her standing here. There's no question, but that plaintiff has an attorney-client relationship with a recognized attorney. And so I don't really understand the focus on the Sixth Amendment, even if it's not a place where you're guaranteed counsel and you've got a due process right to communicate with counsel, to get access to the courts. No question, but this plaintiff has an attorney trying to communicate back and forth. How is that an issue of standing? Well, Your Honor, just to clarify, the state is not arguing that there's no standing to make a First Amendment claim. What's interesting about this case is that standard demonstration has to be, and I think is more difficult for him to be, under the First Amendment. I think that's why the focus has been on the Sixth Amendment. Our position is there is no standing to assert a Sixth Amendment claim because standing is usually about, and it's used in lots of ways, but it's usually about does this plaintiff have such an interest as to permit him to go forward with the claim. It sounds to me arguably he has no Sixth Amendment claim, but the level of his interest seems unquestionable. The level of his interest under the First Amendment, or under anything that he's interested in the result, he may not have a successful Sixth Amendment argument, but why does that mean he doesn't have standing to bring an argument even if it proves unsuccessful? Well, he would have standing as a general matter, but he still needs Article III jurisdiction to assert a Sixth Amendment claim or to prevail on a Sixth Amendment claim, and we aren't just saying that he should fail on a Sixth Amendment claim. Correct me if I'm wrong. It seems to me this expands jurisdiction into the merits, which frequently it does, but you don't question that Mr. Nordstrom has a legitimate interest here in achieving the relief he seeks. You question whether the Sixth Amendment gives him a vehicle to that relief. Yes, I'm sorry, Your Honor. I think I see my time is up. Yes, sir. Thank you very much. I have no other questions. Thank you very much. We'll hear from Mr. Roboto. My friend from the Attorney General's office has put his finger on the key point here. He referred to that specific subset of letters being sent by prisoners to actual lawyers that acknowledge there has been no problems there. That's this case. That's all that needs to be addressed to resolve this case. As the Sixth Circuit said in the Bout decision, the way in which to address this thing, and this is only an outgoing legal mail case, as the Nordstrom one court focused on, is to make sure it's addressed to the appropriate attorney. In terms of how that is accomplished in procedure, the supervisor of the mailroom of the prison testified in the hearing below and said he looks to the directory of attorneys every day. In fact, the Arizona prison identifies who are the attorneys that are interacting with individual prisoners for me to interact with Mr. Nordstrom in this particular appeal. I had to provide a copy of this court's order appointing me as pro bono counsel. That process is straightforward. It can easily be accomplished. It also brings this case back into that First Amendment fold. Other circuits have addressed this under the First Amendment. For example, in Jones v. Barnes, the Third Circuit said not that there's no risk, but that the risk that prisoners are going to conspire cruelly with lawyers is too substantial to justify incursion into confidential mail. The California Supreme Court has said the risk is very small. The Sixth Circuit in the ACLU case that we've cited says that the risk is a parade of oracles. All we're interesting is that outgoing lethal mail be protected. So from your perspective, you would like the court to basically say check whether this is a letter to an attorney, but beyond that, no inspection at all? That's right. And then the checking whether the letter is correctly addressed to the attorney is by looking at the envelope. Because the prisoner has to address the envelope and hand that envelope with the letter and sign it to the correctional office. The Air Force Counsel mentioned that there was some very limited testimony about three bad attorneys. What role, if any, should that play in our deliberation? Those cases did not arise in the Arizona prison system, and none of them involved lethal mail. Each were detected by ordinary law enforcement tools of probable cause. And we have acknowledged all along that the right to confidentiality is, as Arizona has correctly said, nearly sacrosanct but not absolutely sacrosanct. As the Sixth Circuit said in Salier and the Eleventh Circuit in Alameda, if there is probable cause that a prisoner is conspiring with a lawyer, well then, of course, the letter may be read. Thank you both again for your argument. We appreciate it. And, again, we appreciate the involvement of your student lawyers. I hope they have found this to be a worthwhile activity. For a better reason. A whole lot of reason to get people being paid for it. Indeed. Indeed. This case is targeted. The case is targeted as submitted. We thank you.
judges: Clifton, M. Smith, Erickson